VERNON E. PETERSON, APPELLANT AND CROSS-APPELLEE, V. DONALD PETERSON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF HERMAN E. PETERSEN, DECREASED, APPELLEE AND CROSS-APPELLANT.

432 N.W.2d 231

Filed December 2, 1988.   No. 87-155.

Kent F. Jacobs, of Blevens & Jacobs, for appellant.

Daniel F. Kaplan, of Perry, Guthery, Haase & Gessford, P.C., and, on brief, Earl J. Witthoff, of Perry, Perry, Witthoff, Guthery, Haase & Gessford, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Plaintiff-appellant, Vernon E. Peterson, claims his brother, defendant-appellee, Donald Peterson, exercised undue influence upon their now-dead uncle, Herman E. Petersen, as the consequence of which the uncle caused the title to certain certificates of deposit to be changed to plaintiff's detriment. The district court dismissed plaintiff's petition, and plaintiff appeals, assigning as error the district court's conclusion that plaintiff failed to adduce clear and convincing evidence of undue influence. In turn, defendant has cross-appealed, asserting the district court erred in not awarding him an attorney fee because this action is barred by the doctrine of res judicata and is therefore frivolous and not brought in good faith. We affirm.

The record establishes that plaintiff enjoyed a close relationship over a 40-year period with his reclusive bachelor uncle, having operated a salvage business from a portion of his uncle's farm and having been permitted to erect a building on part of the farm in which both plaintiff and the uncle stored items. Plaintiff visited the uncle at the latter's home frequently, indeed on a virtually daily basis, and otherwise ministered to the uncle's needs, including taking the uncle to distant appointments as needed, for which plaintiff, on at least one occasion, received payment.

On January 5, 1984, plaintiff left his home for a winter vacation in Arizona. On January 9, 1984, defendant found the then 86-year-old uncle lying on the floor of his home with a broken hip. Defendant summoned an ambulance, and the uncle was transported to a hospital where he underwent hip

replacement surgery the following day. The uncle remained in the hospital until January 28, 1984, when he was discharged to a nursing home.

In the meantime, on January 17, 1984, the uncle's attorney met with the uncle in his hospital room in connection with the preparation of a general power of attorney giving defendant authority to conduct the uncle's affairs. According to the attorney, the uncle recognized him at that time, was very conversational, and appeared to understand what he was doing. He appeared forceful, interested in the matter at hand, and was not, in the attorney's opinion, under anyone's domination at that time. The attorney thought the uncle was "very positive as to what he wanted."

On that same day, defendant, in taking stock of the uncle's assets pursuant to the uncle's request to see to his affairs, found several certificates of deposit held in joint tenancy by the uncle and plaintiff. Later that same day, the attorney discussed the state of title to these instruments with the uncle. According to the attorney,

> I went up there and he was alone then and I just told him that — I related what his will had said and where he had divided the assets equally among the three nephews and the niece . . . but that apparently he had some CD's that were going a different direction and he told me, he said that's not what I want. He said I want it to all go equally to my nephews and niece . . . .

The following day, January 18, 1984, the attorney again visited the uncle in his hospital room, again out of the presence of other family members. In the attorney's words,

> I went in and talked to [the uncle] again and asked him to restate how he wanted his property divided and how he wanted his will made and he restated that he didn't want to have any trouble after his death and that he felt that equal division would be best . . . .
>
> . . . .
>
> . . . [H]e appeared to be resolute and I thought he was clear-minded and think he still had pain but I couldn't detect that he was under the influence of anything that marred his judgment or anything.

The attorney prepared a document setting out the uncle's intent at the time, because

> if there was any doubt in anyone's mind that this would be a good way to recollect what we had done and so I went in to [the uncle] and discussed the power of attorney that we had made the day before and the last will and testament, and the finding of the assets and other — in [plaintiff's] name, and reviewed everything that had taken place to the best of my ability, and he said yes, this is what I want done. I want my assets to be divided among all of them equally . . . .

At the attorney's suggestion, the uncle then signed the following statement:

> I, the undersigned, Herman E. Petersen, hereby state that I have made Donald Peterson my Power of Attorney; in checking over my property I find that many of my assets held in various banking institutions have been placed in my name in joint tenancy with other parties. I have also made my Will, in which it is my wish that my nephew, Vernon Peterson, is to be given credit for the construction of a building that he built upon my real estate. Subject to that, I want my property divided equally between my three nephews, namely Vernon Peterson, LeRoy F. Peterson, and Donald Peterson, and my niece, namely Doris H. Stephens.
>
> In order to carry out my wish of an equal division of my property, I have directed my Power of Attorney to instruct all of the institutions to place the ownership of my assets in my name only, and not to have a second name upon any of my accounts; I make this instruction, realizing now that if I did not make this instruction that upon my death, those properties would go only to the person whose name appears on that asset with my name, and this would destroy my wish that said properties be divided equally.

The will the uncle executed earlier that day conforms with the foregoing statement of intent.

On January 20, 1984, defendant used the power of attorney to have plaintiff's name removed from the instruments in question. Plaintiff returned from Arizona the next day. On

January 23, 1984, a confrontation between plaintiff and defendant took place in the attorney's office over what had taken place in plaintiff's absence. It is plaintiff's contention that "[the uncle] just told me he wanted me to have [the certificates of deposit] upon his death for looking after him." In an effort to resolve this dispute, the attorney, plaintiff, and defendant met that afternoon in the uncle's hospital room. According to the attorney, during this meeting

> [plaintiff] expressed anger about the appointment of [defendant], and [the uncle] said this is what he had wanted and this is what he was going to do and [plaintiff] said well, I will just go back to wherever he came from, Arizona or somewhere, and they had an exchange there and at that time [the uncle] pointed his finger [at plaintiff] and said I will take you out of my will if you keep this up.

In the attorney's opinion, the uncle was forceful in his manner at this meeting and not under anyone's domination. The uncle died a month later, on February 24, 1984.

The attorney's recitation of the events was corroborated by defendant and supported by the testimony of the brother of both plaintiff and defendant and of the nurses who attended the uncle in the hospital following his hip injury.

The uncle was also attended, while in the hospital, by his family physician, who testified that following surgery, the uncle was mentally alert and knew what was going on around him. This physician, who had known the uncle for 10 to 15 years, testified that the uncle was not one to be influenced by others and that this had not changed following surgery. However, he also testified that the day before the power of attorney was signed, the uncle had received Seconal and Valium at different times and that, although these drugs should not have affected the uncle's thinking processes at the time the power of attorney was signed, the effects of these drugs on older people are unpredictable.

Arrayed against the foregoing is plaintiff's evidence. The uncle's tenant, who visited the uncle in the hospital on January 19, 1984, was convinced that "this old gentleman did not fully understand what he had signed because as — I had this grain in the bin, see, and [defendant] having been given power of

attorney, [the uncle] shouldn't have been asking me to sell the grain for him which he did."

A former neighbor of the uncle, who saw him at the hospital on several occasions, stated that the uncle "thought he was in a nursing home instead of being at the hospital." In the neighbor's opinion, the uncle seemed "real different" in the hospital than when she had known him years before.

An 80-year-old acquaintance of the uncle since childhood shared the uncle's hospital room for a time. According to this witness,

> The mood that [the uncle] was in, he could be talked into anything at that time.
>
> . . . .
>
> . . . He was in the bed beside of me and he said that was a torture chamber, he said. He had that broken hip, see, and he was kind of grouchy, and it seemed like he didn't care for nothing at that time.

According to plaintiff, his uncle was generally confused and had been wrongly told plaintiff had gone to Arizona "for good."

We first address defendant's cross-appeal, for if his contention that the doctrine of res judicata bars this action is correct, we need not consider plaintiff's appeal. Defendant argues that plaintiff's allegation of undue influence was litigated in earlier proceedings in which plaintiff unsuccessfully contested the uncle's last will and testament in district court and, in subsequent probate proceedings, unsuccessfully sought to assert in the county court a claim against the estate for the amount of the very certificates of deposit now in question. Indeed, the bill of exceptions developed as a result of the will contest was offered in evidence in this case and comprises a major portion of the evidence bearing on the undue influence issue allegedly exercised with respect to the certificates of deposit.

Defendant correctly points out that any right, fact, or matter in issue and directly adjudicated upon, or necessarily involved in, the determination of an action before a court of competent jurisdiction in which a judgment or decree is rendered upon the merits is conclusively settled by the judgment therein and

cannot again be litigated between the parties or their privies, irrespective of whether the claim or demand, purpose, or subject matter of the two suits is the same. *NC+ Hybrids v. Growers Seed Assn.*, 228 Neb. 306, 422 N.W.2d 542 (1988); *Vantage Enterprises, Inc. v. Caldwell*, 196 Neb. 671, 244 N.W.2d 678 (1976). However, the matter of undue influence regarding the power of attorney under which the title to the certificates of deposit was changed was not in issue and directly adjudicated upon, or necessarily involved in, the determination of the prior will contest between the parties.

In reaching its finding that undue influence was not practiced upon the uncle in connection with his will, the jury as the finder of fact was concerned with the inferences to be drawn from the evidence concerning the circumstances under which that document came into existence, a day after execution of the power of attorney in question. Although evidence concerning the subject power of attorney and treatment of the certificates of deposit overlaps that concerning the execution of the will, the jury in the will contest was not required to decide whether defendant procured a change in the title to the certificates as the result of undue influence. Thus, the matter in issue in the present case was neither directly adjudicated upon, nor necessarily involved in, the determination of the will contest.

On the other hand, plaintiff's county court claim against the estate for the value of the certificates of deposit was made on the basis that those certificates constituted payment for services plaintiff had rendered the uncle and that the undue influence defendant had practiced deprived plaintiff of their value. Therefore, the undue influence at issue in plaintiff's county court claim against the estate is the very undue influence at issue in the present case.

However, defendant moved for summary judgment in the claim proceedings on the ground that the will contest had determined the issue adversely to plaintiff. The county court sustained defendant's motion, saying the issue "may not now be raised." Plaintiff appealed that decision to the district court which, correctly or incorrectly, ruled that the county court lacked jurisdiction to determine the matter. As a result, the district court vacated the summary judgment granted

defendant and remanded the matter to the county court "for further proceedings consistent" with the district court's ruling. The county court then dismissed plaintiff's claim. As a consequence, no adjudication was ever made on the merits of plaintiff's claim against the estate.

Thus, the action at hand is not barred by the doctrine of res judicata, and its pursuit cannot be said to be frivolous or in bad faith. See *Lutheran Medical Center v. City of Omaha*, 229 Neb. 802, 429 N.W.2d 347 (1988). Accordingly, the district court was correct in not awarding attorney fees to defendant.

The foregoing resolution of defendant's cross-appeal means that we must concern ourselves with plaintiff's appeal. As part of the analysis of the issue presented by plaintiff's specific assignment of error, whether the evidence supported his allegations, we must both determine the scope of our review and settle upon the quantum of evidence required to prove undue influence in this type of case.

An action to set aside inter vivos transfers of property on the basis that they were made as the result of undue influence is one in equity and, as such, is reviewed by this court de novo on the record. *Fremont Nat. Bank & Trust Co. v. Beerbohm*, 223 Neb. 657, 392 N.W.2d 767 (1986). In such cases undue influence must be proved by clear and convincing evidence. *In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986). However, an action alleging undue influence in a probate context lies at law, and, as such, the findings of the trier of fact will not be disturbed unless clearly wrong. *In re Estate of Marsh*, 216 Neb. 129, 342 N.W.2d 373 (1984). Undue influence in the probate context must be proved by a preponderance of the evidence. *In re Estate of Price, supra*.

A certificate of deposit in the names of multiple parties is a type of joint account. Neb. Rev. Stat. § 30-2703(a) (Reissue 1985) provides: "A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." So far as is relevant to our inquiry, the comment thereto states that the statute, of which the quoted subsection is a part, "reflects the assumption that a person who deposits funds in a multiple-party account

normally does not intend to make an irrevocable gift of all or any part of the funds represented by the deposit. Rather, he usually intends no present change of beneficial ownership."

Clearly, the creation or termination of a joint account is neither a present transfer of property nor a testamentary device, but represents instead a hybrid transaction, sharing aspects of both gift and bequest. In an action by the deceased mother's estate against the estate of her deceased son, this court, relying upon the aforesaid statutory provision and comment, determined that the evidence failed to clearly and convincingly establish that the mother intended a gift to her son of moneys she deposited in a joint account with her son and another, and thus upheld the award of a judgment in favor of the mother's estate for the moneys the mother had deposited in the joint account. *In re Estate of Redpath*, 224 Neb. 845, 402 N.W.2d 648 (1987).

Similarly, in the present case the evidence fails to clearly and convincingly establish that the uncle intended an irrevocable inter vivos gift to plaintiff of the moneys placed in the joint certificates of deposit. Indeed, the evidence clearly and convincingly establishes the opposite is true; even the plaintiff testified that the certificates of deposit were not to become his until his uncle's death. Furthermore, Neb. Rev. Stat. § 30-2706 (Reissue 1985) expressly provides:

> Any transfers resulting from the application of section 30-2704 [which details the incidents of the right of survivorship in, among other things, joint accounts] are effective by reason of the account contracts involved and this statute and are not to be considered as testamentary or subject to Articles 22 to 25 of this code.

The scope of this court's review of the district court's findings of fact regarding an allegation of undue influence in the creation or termination of a joint account is a matter of first impression. In *Redpath, supra*, conversion was alleged, not undue influence, nor did we discuss the scope of review on the question. In *Rorabaugh v. Garvis*, 198 Neb. 223, 252 N.W.2d 161 (1977), this court again did not discuss the standard the court applied in reviewing the evidence, leading to the conclusion a gift had been intended. And, finally, in *Parkening*

*v. Haffke,* 153 Neb. 678, 46 N.W.2d 117 (1951), decided prior to the enactment of § 30-2703, an accounting was sought, which this court treated as a matter in equity.

One who knowledgeably creates a joint account with another arguably does so with the present intent to employ the account's survivorship characteristic in substitution for a testamentary device. Like testamentary devices, under § 30-2703 creation of a joint account, without more, accomplishes no present transfer of title to property. If, as in this case, all sums deposited into the joint account are deposited by one person, the joint account contemplates transfer of title to those funds to the other person or persons named on the account upon the death of the depositor. Of course, others named as joint holders of the account have the power to withdraw funds from the account before the death of the depositor, but under § 30-2703, they arguably do not have the right to do so. *In re Estate of Redpath, supra.* See, also, *Craig v. Hastings State Bank,* 221 Neb. 746, 380 N.W.2d 618 (1986), exploring the depository bank's right to set off the debts of one cotenant of a joint account against the account, when the other cotenant had contributed the funds thus reached.

Moreover, the creator of a joint account, like the maker of a will and unlike the giver of a gift, may change his or her mind during any lucid moment prior to death. These considerations suggest that joint accounts share more in the character of testamentary devices than they do in the character of present transfers of property, or gifts. Accordingly, we conclude that an allegation of undue influence in effecting a change in the ownership of a joint account sounds in law, rather than in equity. Thus, as noted earlier, the findings of the district court are not to be disturbed unless clearly wrong.

While, as established earlier, only a preponderance of the evidence is needed to sustain a finding of undue influence in a probate contest, in view of the language of § 30-2703(a) requiring clear and convincing evidence to overcome the statutory assumption that no gift is intended by depositing funds in a joint account, we hold that clear and convincing evidence is required to sustain a finding of undue influence in effecting a change in the ownership of such an account. (For

another application of the clear and convincing standard of proof in a law action, see *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984), which required such quantum of proof in a suit to recover on lost promissory notes.)

Thus, the district court held the plaintiff to the correct standard of proof, and the record provides no basis for concluding that the district court's finding of no undue influence under that standard is clearly wrong. Accordingly, the judgment of the district court must be, and hereby is, affirmed.

AFFIRMED.