In re Estate of Bessie I. Peterson, deceased.
Francis J. Glinn et al., appellants, v. Eldon J. Peterson et al., appellees.

439 N.W.2d 516

Filed May 12, 1989.   No. 87-406.

Sandra I. Schefcik, of Schefcik Law Firm, for appellants.

Robert E. Roeder, of Roeder & Anderson, for appellees.

Hastings, C.J., Boslaugh, White, Caporale, Grant, and Fahrnbruch, JJ.

Grant, J.

The parties to this action are the five sons of the decedent, Bessie I. Peterson. Appellants, Francis J. Glinn, Marvin L. Peterson, and Dale I. Peterson (contestants), filed a "Petition for Formal Probate of Will and Formal Appointment of

Personal Representative" in the county court for Arthur County, seeking the admission to probate of Mrs. Peterson's last will and testament, executed September 6, 1972, and objecting to a codicil to the will, executed January 16, 1985. Appellees, Eldon J. Peterson and Donald R. Peterson (proponents), are the proponents of the codicil, and Eldon Peterson apparently had offered the will and codicil for informal probate. Contestants' petition alleged, in part, that Mrs. Peterson executed the codicil as the result of undue influence on the part of Eldon Peterson and that Mrs. Peterson lacked testamentary capacity when she executed the codicil. All parties conceded the validity of the 1972 will.

Pursuant to Neb. Rev. Stat. § 30-2429.01 (Reissue 1985), the matter was transferred to the district court for Arthur County. At the request of the parties, venue was transferred to Keith County pursuant to Neb. Rev. Stat. § 24-902 (Reissue 1985), and the matter was tried before a jury in Keith County. The only issues at trial concerned the status of the codicil.

The will and codicil were received in evidence during the proponents' case in chief, and proponents then rested. After the close of the contestants' case, the district court sustained proponents' motion for a directed verdict on the issue of undue influence and directed a verdict for the proponents on that issue. The proponents then presented rebuttal testimony. At the close of all the evidence, the district court overruled both parties' motions for directed verdict on the remaining issue of testamentary capacity, and that issue was submitted to the jury. The jury returned a verdict for the proponents on the issue of testamentary capacity. The contestants timely appealed and assign as errors in this court the actions of the trial court in (1) granting the proponents' motion for directed verdict on the issue of undue influence and (2) failing to grant contestants' motion for directed verdict on the issue of testamentary capacity in that the proponents did not prove by a preponderance of the evidence that Mrs. Peterson had testamentary capacity at the time she executed the codicil. We affirm.

The record shows the following. Marvin, Dale, Eldon, and Donald Peterson are the sons of the decedent and her late

husband John Peterson. Francis Glinn is Mrs. Peterson's son by a previous marriage. The family lived on John Peterson's 14,000-acre livestock ranch in Arthur County while the five sons were growing up and attending high school.

All of Mrs. Peterson's five sons worked on the ranch while they were in high school. Donald, Dale, and Marvin Peterson all attended college.

Appellant Francis Glinn testified that he returned to work on the ranch for 3 years after leaving the merchant marine in 1946. For the past 30 years, Glinn has operated his own livestock ranch 9 miles north of Keystone, Nebraska.

Appellant Dale Peterson testified that he attended Kearney State College after graduating from high school in 1948, and continued to work on the family ranch during college vacation. He decided to leave the ranch because "there didn't seem to be enough for all of us there." Dale formerly taught in Hastings. He currently resides in Omaha and teaches at Metropolitan Community College.

Appellant Marvin Peterson, the youngest son, testified that he had full responsibility for the ranch from the time he graduated from high school in 1957 until 1959, when Eldon returned from the Army. Marvin attended the University of Nebraska in 1959 and worked on the ranch during summer vacations until he graduated with an engineering degree in 1964. He lives in Ponca City, Oklahoma, and is employed as an engineer.

Appellee Donald Peterson is the oldest son of Bessie and John Peterson and works as a chemical engineer in Columbus, Nebraska. He testified that he worked on the ranch during college vacations and, even after college, has returned regularly to help with branding cattle.

Appellee Eldon Peterson, the second-youngest son, did not go to college, but stayed on the ranch with his father and mother. Marvin Peterson admitted that Eldon was on the family ranch "everyday of his life" except the time he spent in the Army. John Peterson was semiretired in 1959 when Eldon returned from the Army, and Eldon assumed management of the ranch at that time.

When John Peterson died in 1968 at the age of 78, he devised

one-half of the ranchland to his wife, and undivided interests in the other half to his sons, Marvin, Dale, Eldon, and Donald, subject to Eldon's option to purchase the land at a price designated in John Peterson's will. Francis Glinn received a legacy of $10,000 cash from John Peterson.

Eldon and his mother continued the cattle operation on an equal partnership basis. At the time of Mrs. Peterson's death in January 1985, Eldon owned three-fourths and she owned one-fourth of the 14,000-acre ranch.

Mrs. Peterson had medical problems for many years, beginning with the removal of her left kidney in 1956. On September 6, 1972, Mrs. Peterson executed her last will and testament, devising equal shares of her real and personal property to her five sons, subject to Eldon Peterson's option to purchase certain farm and ranchland. The will named Delbert O. Cole as executor and Keith County Bank & Trust Company as substitute executor of the will.

Mrs. Peterson remained on the ranch after her husband's death and kept house for Eldon until 1982, when she had a stroke and was placed in a nursing home. After the stroke, her left side was essentially paralyzed, but she was sometimes able to walk with the help of a physical therapist. Eldon visited his mother at least once a week during the time she was in the nursing home. The other Peterson sons lived some distance away, but also visited their mother on a somewhat regular basis, two or three times a year. Appellant Glinn, who operated his own ranch north of Keystone, testified he visited his mother "probably a half a dozen times" in 3 years.

Several witnesses testified during the contestants' case as to Mrs. Peterson's physical and mental state after her stroke. Nursing home personnel testified that Mrs. Peterson was "alert" during 1982 and 1983. During that period, she could feed herself, wheel herself in her wheelchair, write letters, watch television, use the telephone, and hold conversations. She apparently suffered a renal failure in the fall of 1984. A nurse's aide testified that by December 1984 Mrs. Peterson was "somewhat alert, [but] wasn't totally alert." There is evidence that Mrs. Peterson sometimes was disoriented as to time, that she made errors in her correspondence, and that her letters to

relatives did not totally make sense.

A doctor examined Mrs. Peterson on January 5, 1985, in the Ogallala hospital emergency room. She had been diagnosed as diabetic some time prior to this examination. He testified that in January 1985 Mrs. Peterson had very erratic blood pressure and gross intestinal bleeding. She was taking a variety of medications, complained of weakness, and was unable to eat. The doctor did not give Mrs. Peterson an orientation test. He was of the opinion that a person in her condition taking these medications might possibly have trouble with clear thinking, but was unable to form an opinion as to whether Mrs. Peterson had the necessary testamentary capacity on January 5 to make a will or codicil.

During the last month of her life, Mrs. Peterson sometimes appeared depressed and withdrawn, and often cried. She had difficulty eating, lost weight, slept frequently, and lost interest in her appearance. She told the nurse's aides she believed she was going to die. Like other elderly patients, however, Mrs. Peterson had "good days and bad days." Nursing home employees testified that on a good day, she was cheerful and able to respond.

In early December 1984, Eldon Peterson told his mother's attorney, James A. Lane, that Mrs. Peterson wanted to see him at the nursing home to discuss a change in her will. Neil Williams, a partner of Lane's, testified that Mrs. Peterson, not Eldon, was their client, although Williams did meet with Eldon once or twice to get a list of machinery. Williams also researched the issue of testamentary capacity and prepared a memorandum to Lane, his senior partner, about topics that should be covered when interviewing Mrs. Peterson. Williams testified that he participated in a conference with Mrs. Peterson and assisted in drafting the codicil.

On January 16, 1985, Mrs. Peterson executed the codicil to her will, changing the provisions of her will by devising to Eldon Peterson all her livestock and household goods. The codicil also modified the will in nominating Eldon Peterson as personal representative of the estate. The codicil did not modify the will in any other respect.

Mrs. Peterson's execution of the codicil, and the signing by

the witnesses to the codicil, was videotaped at the nursing home. Eldon Peterson was not present, but arrived at the nursing home after the codicil was signed. The conversation between Lane and Mrs. Peterson before the execution of the codicil also was videotaped. In that conversation, Mrs. Peterson was asked about the extent of her property, about the time of her husband's death, and about the time of a fire that destroyed her home. When asked why she wanted to leave all her cattle to Eldon, she stated that Eldon "took care of me all these years. He's been good to me, and he's a good manager." She wanted to give Eldon her household goods because "he paid for most of them" after the fire. In response to other questions, Mrs. Peterson indicated she realized that under the terms of the codicil Eldon would receive a larger share than the other children, but that "[Eldon] worked harder. . . . And he stayed there at home when none of the rest of them did." She further stated that she wanted to change her will, signed the codicil, and said, "I'm doing it because I want to."

Mrs. Peterson died on January 25, 1985, at the age of 81.

We review this probate case for error appearing on the record. *In re Estate of Miller,* 231 Neb. 723, 437 N.W.2d 793 (1989).

Contestants first contend that the trial court erred in granting the proponents' motion for directed verdict on the issue of undue influence.

In order to successfully contest a will or codicil on the ground of undue influence, the contesting parties must prove by a preponderance of the evidence that (1) the testator was subject to undue influence, (2) there was an opportunity to exercise such influence, (3) there was a disposition to exercise such influence, and (4) the result was clearly the effect of such influence. *In re Estate of Price*, 223 Neb. 12, 388 N.W.2d 72 (1986); *In re Estate of Villwok*, 226 Neb. 693, 413 N.W.2d 921 (1987); *Peterson v. Peterson*, 230 Neb. 479, 432 N.W.2d 231 (1988). Not every exercise of influence will vitiate a will. Undue influence sufficient to defeat a will is such manipulation as destroys the free agency of the testator and substitutes another's purpose for that of the testator. *In re Estate of Price, supra*; *In re Estate of Villwok, supra*.

Upon a motion for directed verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the opposing party. The party against whom the motion is directed is entitled to the benefit of all proper inferences which can reasonably be deduced from this evidence. *In re Estate of Price, supra.* A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Artex, Inc. v. Omaha Edible Oils, Inc.*, 231 Neb. 281, 436 N.W.2d 146 (1989).

In granting proponents' motion for directed verdict on the issue of undue influence, the district court determined that the evidence presented by the contestants, when taken in a light most favorable to the contestants, established that while Mrs. Peterson was vulnerable to undue influence because of her age and health, and Eldon had an opportunity to exercise undue influence because he saw his mother once a week, there was no evidence at all to suggest that Eldon was disposed to exercise undue influence or that the codicil was clearly the effect of such influence. Rather, the terms of the codicil reflected Mrs. Peterson's recognition of the special business relationship she had with Eldon for 17 years. That relationship was not shared with any of her other children.

After reviewing the record, we determine that the trial court did not err in granting the proponents' motion for directed verdict on the issue of undue influence.

The contestants also contend that the district court erred in overruling their motion for directed verdict on the issue of testamentary capacity, made at the close of the proponents' rebuttal testimony.

One possesses testamentary capacity if she understands the nature of her act in making a will or codicil thereto, knows the extent and character of her property, knows and understands the proposed disposition of her property, and knows the natural objects of her bounty. *In re Estate of Villwok, supra.* Testamentary capacity is tested by the state of the testator's mind at the time the will or codicil is executed. *Id.*

Several of the contestants' witnesses testified to Mrs. Peterson's general decline during 1984 and that she had good

days and bad days during the last month of her life. Mrs. Peterson had not discussed the terms of her will or the codicil with any of the witnesses other than attorneys Lane and Williams.

Only three of the contestants' witnesses specifically recalled seeing Mrs. Peterson on the day the codicil was executed. Teresa Gibson, a nurse's aide, recalled seeing attorneys and video equipment at the nursing home on January 16, 1985. Gibson testified that she stood in an open doorway and watched some of the videotaping. She observed that Mrs. Peterson was in her wheelchair, with her head down and her eyes closed, and appeared to be asleep. Dora Caudy, the laundry supervisor at the nursing home, testified that she had been asked to witness the codicil, but was reluctant to do so because, "I just didn't think that she knew what she was doing." The jury saw the videotape of the signing of the codicil, and by its verdict, it is apparent that it gave little weight to this testimony. Our examination of the videotape on this appeal leads to the same conclusion.

During the videotaped conversation, Mrs. Peterson stated her age as 79 rather than 81 and made mistakes regarding the year her house burned down and the year her husband died. She misstated that the ranch consisted of 1,400 acres but corrected herself, agreeing that the ranch was 14,000 acres. She was aware that she owned a one-fourth interest in the ranch and knew generally the extent of her cattle holdings. Mrs. Peterson also was aware that she held certificates of deposit, but did not know the exact amount of money so held. She stated that Eldon told her everything about the business. When naming her sons, she had to be reminded of Marvin, but she knew where all her sons lived and knew their occupations. Mrs. Peterson acknowledged that her stroke affected the use of her left arm but said, "It didn't hurt my head any."

Due to the manner in which the case was tried on the issue of testamentary capacity, the bulk of proponents' evidence was presented in their rebuttal case. Lane, an attorney of 47 years' experience, testified that at the time of this trial, more than 50 percent of his practice involved probate work, and that he had drafted over 4,000 wills or codicils during the course of his

career. Lane met with Mrs. Peterson on January 13, 14, 15, and 16. During those meetings, she had contemplated disinheriting Glinn, but decided not to do so. Mrs. Peterson told Lane she wanted to give Eldon her interest in the cattle because she was grateful for all Eldon had done for her and was worried about the burden it would be for him to raise the cash to buy cattle from the estate. She also requested that the codicil name Eldon as personal representative. Lane testified he was of the opinion that on January 16, 1985, Mrs. Peterson knew generally the extent of her property, knew what was in the codicil, knew what she was doing in the codicil with the property, and knew the purposes of a codicil. Williams, who was present during the videotaping, also testified that Mrs. Peterson had the capacity to execute the codicil.

Rebuttal witness Charley Simineo, the nursing home administrator on January 16, 1985, witnessed the codicil. At the time of trial, Simineo was employed as health/medical facilities coordinator for the State of Wyoming. He holds a bachelor's degree in gereology from the University of Northern Colorado in Greeley. Simineo testified that it was common for elderly people to mix dates, years, and periods of time between occurrences. He was aware that Mrs. Peterson had this problem, but was of the opinion that it would not affect her mental capacity. Simineo also was of the opinion that on January 16, 1985, Mrs. Peterson knew the natural objects of her bounty, the extent and nature of her property, and the nature of her signing the codicil, and understood the proposed disposition of her property in the codicil. He further testified that Caudy, a witness called by the contestants, had not been asked to witness the codicil, as she had testified. .

Appellee Donald Peterson was not present at the nursing home on January 16 but, based on his review of the videotape, was of the opinion that on January 16 his mother knew the members of her family, that she knew in general what she owned, that she knew she was executing a codicil that changed her will, and that she knew what the codicil was for. Donald Peterson obviously was testifying against his own personal financial interest, in that the codicil reduced his share of his mother's estate. Donald testified that his mother had a close

relationship with Eldon and that some time after her will was executed she "made a very special point of telling me that she was going to take care of Eldon because he was considerate of her needs and wishes and she appreciated it. I have known it for years, what she intended to do." He testified that he became a proponent of the codicil when, "Finally it got to the point that only due, my mother's reputation . . . I felt duty-bound, there was nothing I could do but to agree to help support what she wanted to do."

The testimony relating to the issue of testamentary capacity was not such that reasonable minds could draw but one conclusion therefrom. The trial court properly overruled both contestants' and proponents' motions for directed verdict and submitted the issue to the jury. The evidence was sufficient to establish by a preponderance that Mrs. Peterson understood the nature of her act, knew generally the extent and character of her property, knew and understood the proposed disposition of her property, and knew the natural objects of her bounty. The errors assigned are without merit.

The judgment of the district court is affirmed.

AFFIRMED.

SHANAHAN, J., not participating.