*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| OLIVE KATHRYN PURCELLA, | ) | |
| | ) | Supreme Court No. S-14770 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-10-12346 CI |
| v. | ) | |
| | ) | O P I N I O N |
| OLIVE KATHRYN PURCELLA TRUST, | ) | |
| | ) | No. 6894 – April 18, 2014 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Ted Stepovich, Law Office of Ted Stepovich, Anchorage, for Appellant. Jonathon A. Katcher, Pope & Katcher, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, and Bolger, Justices. [Maassen, Justice, not participating.]

BOLGER, Justice.

## I. INTRODUCTION

Olive Kathryn Purcella (Kathryn) filed a petition in the Anchorage superior court to reform or terminate the Olive Kathryn Purcella Trust (the trust). The superior court held, after trial, that Kathryn had not shown by clear and convincing evidence that she did not intend to execute an irrevocable trust or that the trust was the product of undue

influence. It accordingly denied her petition. Kathryn appeals, arguing that the factual findings on which the superior court predicated its ruling were clearly erroneous. We affirm the judgment of the superior court because Kathryn has not established that the key factual findings on which the superior court based its conclusion were clearly erroneous.

## II. FACTS AND PROCEEDINGS

### A. Facts

Kathryn is the widow of Tony Purcella. She has five sons: Danny, Rick, Gorden, Steve, and Mark.

Before Tony Purcella's death in 2000, he and Kathryn owned 52% of the stock in Anchorage Roofing and Contracting, Inc. (Anchorage Roofing), a closely held family corporation. Although Kathryn was the devisee of Tony's shares, Rick, acting as the personal representative of Tony's estate, transferred those shares back to the corporation without informing Kathryn or obtaining her consent. Kathryn sued Rick and Anchorage Roofing, claiming breach of fiduciary duties and conversion. The parties submitted their dispute to binding arbitration. In an April 15, 2008 decision, the arbitrator found for Kathryn and ordered Rick, among other things, to pay Kathryn $3,500 per month and to quitclaim certain real property to her. A substantial portion of these obligations have not been met.

Sometime in 2007, Donna, Steve's wife and Kathryn's daughter-in-law, began helping Kathryn pay her bills. At first, Donna helped Kathryn organize the bills and mail the checks. When Kathryn began to have difficulty writing and signing the checks because of a hand tremor, however, she set up a joint account with Donna so that Donna could write and sign the checks herself. Once the joint account was in place, at Kathryn's request all of her bills were sent directly to Donna's home.

Donna testified that she discovered that Mark was "going through vast sums" of Kathryn's money; she testified that he spent "about a hundred thousand dollars

in one year." Mark made "constant, aggressive, and unreasonable demands for money" from Kathryn and, later, from Donna. Witnesses testified that Mark even orchestrated elaborate cons to convince Kathryn and Donna to give him money.

At some point in 2008, Bill Ingaldson, Kathryn's attorney in the Anchorage Roofing litigation, began discussing with Kathryn the possibility of creating a trust. Ingaldson testified that the trust came up in the context of a discussion about the money Kathryn was to receive through the Anchorage Roofing arbitration decision, Kathryn's future medical expenses, and Mark's frequent requests for money. But it was disputed whether Ingaldson or Donna first suggested a trust to Kathryn. The record suggests that Donna wrote an email to Ingaldson in August 2008, raising similar concerns about Mark and about Kathryn's medical care. There was also testimony that Donna had several one-on-one conversations with Ingaldson about Mark's demands for money.

As a result of his conversations with Kathryn, Ingaldson recommended that she meet with John Colver, who had done estate planning work for Kathryn and Tony in the past. On August 10, 2008, Kathryn, Ingaldson, Donna, and Danny met with Colver. The group talked about "the Mark problem extensively." Colver testified that, during this meeting, he "mentioned that probably an irrevocable trust was a good idea," both as a means to protect Kathryn from Mark and as a Medicaid planning device. He also testified that he explained to Kathryn what an irrevocable trust was and how the trust would operate. Ingaldson confirmed that the group talked about the "general idea of a trust, whether [Kathryn] wanted to set up a trust, what we'd put in the trust, [and] how a trust would work." Colver testified that, at the end of the meeting, Kathryn told him that an irrevocable trust "looked good to her." So, after the meeting, Colver wrote up a draft trust for Kathryn.

The family met with Colver again in December 2008 to talk about the draft trust. Colver testified that, during that meeting, he "went through the express provisions"

-3-                                                                                          **6894**

of the trust instrument. There was testimony that Ingaldson asked Colver questions about the draft and helped translate some of its provisions into layman's terms to make sure that Kathryn understood their legal effect. Both Ingaldson and Colver testified that they explained to Kathryn that the trust was irrevocable and that the trustee would have complete discretion over the distribution of trust funds.

Kathryn executed the trust in February 2009. Before she signed the instrument, she met privately with Colver. Colver testified that he explained to Kathryn at that meeting that "when you put all your money into this irrevocable trust, you can't get it back. It's gone." He asked her whether she "really want[ed] to" create a trust and told her that she was not obligated to sign the trust instrument. According to his testimony, Kathryn confirmed that she wanted to create an irrevocable trust and signed the document.

Colver testified that Kathryn "listened intently" during all of these meetings and that she confirmed many times that she understood what an irrevocable trust is and that she wanted to create one. Ingaldson, Donna, and Danny all agreed that Kathryn actively participated in the trust discussions and spoke up when she had questions.

However, Kathryn testified at trial that she never intended to put her property into a trust and that she did not know what an irrevocable trust was at the time the trust instrument was drafted. She testified that, had she known that once she put her property in the trust she could not get it back, she would never have executed the trust.

The trust instrument states explicitly that the trust is irrevocable. Consistent with Colver's recommendations, the trust appoints Donna trustee and provides that "[t]he Trustee shall manage [the trust] for the use and benefit of [Kathryn,] as primary lifetime Beneficiary of the trust." The trustee has "sole and absolute discretion" over the amount and frequency of payments to Kathryn.

Upon Kathryn's death, the remaining principal is to be distributed to Danny, Steve, and Mark. The trust provides for no distribution to Rick or Gorden. This arrangement is consistent with a will Kathryn drafted in 2002, which provided for a similar distribution of property.

During her tenure as trustee, Donna had some conflicts with Kathryn over the administration of the trust. For example, although Donna paid many of Kathryn's cell phone bills, there was one bill that she failed to pay. Donna testified that Mark, who was on the same cell phone account, continuously accrued large charges on the account, and that she discussed this problem with Kathryn every month. Donna tried to decrease the charges by changing to a different phone plan, but the bills continued to run into the hundreds of dollars. The last bill, which Donna refused to pay, cost, according to her testimony, between $500 and $800.

Kathryn also frequently asked Donna for money while Donna was trustee. Donna testified that Kathryn always wanted money for Mark; she never wanted for money for herself. Each time Kathryn requested money, Donna would explain that there were not enough funds in the trust to both satisfy the request and meet Kathryn's outstanding expenses. Donna testified that, whenever she had these conversations with Kathryn, they would discuss Donna's role as trustee.

Meanwhile, because of the Anchorage Roofing litigation, Kathryn was estranged from Rick and his wife Kathy at the beginning of 2010. However, in the spring of that year, Rick and Kathy started to invite Kathryn to lunch. During the summer, Kathryn spent time on the Kenai River with Rick and his family and, in August, Kathryn moved in with Rick and Kathy. There was testimony that Kathryn's other family members had trouble contacting Kathryn after the move. Ingaldson testified that he tried to reach Kathryn in 2010 to discuss the dispute over her trust, but was told by Ted Stepovich, Kathryn's attorney in this lawsuit, that Kathryn did not want to speak with

him. However, Rick's wife Kathy denied that she had isolated Kathryn from the rest of her family. Kathryn testified on cross-examination that she was not aware that Donna, Danny, and Steve had tried to contact her, and said that if she had known they wanted to spend time with her, she would have seen them.

Starting in June 2010, Kathryn began making demands for a copy of the trust from Donna and Colver. Although Donna allowed Kathryn to read the trust instrument, she would not give Kathryn a copy of the instrument or allow her to take the original home. Donna testified that she thought Mark was pressuring Kathryn to get a copy of the instrument, and she was afraid of what Mark would do if he obtained a copy of the trust.

On July 26, 2010, Danny, Donna, and Kathryn went to Colver's office to address Kathryn's concerns about the trust. When Colver spoke with Kathryn alone, she told him that she was upset because Donna had not paid some bills. On Colver's suggestion, Kathryn asked Donna to resign, and Danny succeeded her as trustee. Colver agreed that Kathryn did not indicate at that time that she felt "she had been hoodwinked into signing an irrevocable trust that she never understood."

## B. Proceedings

On November 23, 2010, Kathryn filed a petition to terminate or reform the trust in the Anchorage superior court. She argued that the trust should be reformed "to conform to her intentions due to a mistake of fact or law in the expression of the trust and/or inducement to create the trust." She alleged that "[i]t was not anticipated by Mrs. Purcella that the circumstance would arise where she would have no control as to when or if her bills would be paid, or when or how her money was to be spent" and that "[m]isrepresentations were made by Donna Purcella, Danny Purcella, and Michael Steven

Purcella to Mrs. Purcella in regard to the nature and purpose of the documents she signed."[1]

Kathryn's petition was tried without a jury in May and August 2011. On September 22, 2011, the court issued a decision denying Kathryn's petition. It found that Kathryn had not shown by clear and convincing evidence that she "made mistakes in establishing the Trust" or "had an intention which was contrary to that which she manifested in the Trust documents." The court also concluded that Kathryn had "presented no evidence to support a claim of undue influence."

Kathryn appeals.

## III. STANDARD OF REVIEW

We review the superior court's findings of fact for clear error.[2] "Findings are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us with a definite and firm conviction that a mistake has been made."[3] We "grant particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence."[4]

---

[1] The superior court construed the latter allegation as stating an undue influence claim.

[2] Alaska R. Civ. P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous . . . ."); *Stewart v. Elliott*, 239 P.3d 1236, 1239-40 (Alaska 2010).

[3] *Thea G. v. State, Dep't of Health & Soc. Servs.*, 291 P.3d 957, 961-62 (Alaska 2013) (internal quotation marks omitted).

[4] *Day v. Williams*, 285 P.3d 256, 260 (Alaska 2012) (internal quotation marks omitted); *see also* Alaska R. Civ. P. 52(a) ("[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

However, the superior court's application of law to fact is reviewed de novo.[5] Therefore, we independently review the superior court's conclusion that, based on its factual findings, trust reformation was not warranted under the applicable law.[6]

## IV. DISCUSSION

### A. Trust Reformation

On appeal, Kathryn argues that reformation is warranted because the trust instrument does not conform to her original intent, because unanticipated circumstances have arisen since the trust was executed, and because she, as "both . . . the settlor and sole life beneficiary of the trust," has the power to modify the trust by consent. We address each of these arguments in turn.

#### 1. Reformation to conform to the settlor's intent

Alaska Statute 13.36.350(a) provides that

> [o]n petition by a trustee, settlor, or beneficiary, a court may reform the terms of an irrevocable trust, even if the trust instrument is not ambiguous, to conform to the settlor's intention if the failure to conform was due to a mistake of fact or law, whether in expression in the trust or inducement to create the trust . . . .[7]

---

[5] *Reed v. Parrish*, 286 P.3d 1054, 1057 (Alaska 2012); *Riddell v. Edwards*, 76 P.3d 847, 852 (Alaska 2003).

[6] *Cf. Diblik v. Marcy*, 166 P.3d 23, 25 (Alaska 2007) ("Whether a misrepresentation is material is a mixed question of law and fact."); *Beavers v. State*, 998 P.2d 1040, 1044 (Alaska 2000) ("We review the trial court's determination concerning the voluntariness of [a] confession as a mixed question of law and fact.").

[7] Although Kathryn seeks to have the trust terminated, AS 13.36.350(a) only permits trust *reformation*, not termination. However, it is possible the trust could be reformed to make it revocable rather than irrevocable.

To reform a trust under this provision, the petitioner must prove the settlor's intent by "clear and convincing evidence."[8] A fact is established by clear and convincing evidence if "the truth of the asserted fact[] is highly probable."[9]

On appeal, Kathryn argues that the trial court clearly erred when it found "that Kathryn intended to create an irrevocable trust, that she understood the terms of the trust and the fact that it was final."[10] She notes that, in her own testimony, she "clearly stated that she never intended to transfer all of her property into a trust," that "nobody ever explained to [her] and she did not understand that once she put her property into a trust, she no longer owned or had control of that property," and that, "[h]ad she been told that once she signed property over to the trust, she no longer owned that property, she would not have signed the property over or created the trust."

But Donna, Colver, Ingaldson, and Danny all testified that Kathryn understood the effect of the trust at the time it was executed and intended to transfer all of her property to the trust, and the superior court found their testimony more credible than Kathryn's. Because we give deference to the superior court's credibility

---

[8]    AS 13.36.350(a).

[9]    *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 275 n.3 (Alaska 2003) (internal quotation marks omitted).

[10]    Kathryn appears to attach some weight to the fact that the superior court adopted its factual findings more or less verbatim from the Trust's proposed findings. However, that fact has no bearing on our review of the superior court's findings. *See Strack v. Miller*, 645 P.2d 184, 186 n.1 (Alaska 1982) ("The 'clearly erroneous' standard is still to be applied when, as here, the trial court's findings of fact are adopted from those submitted by the prevailing party.").

determinations,[11] the fact that Kathryn's testimony contradicted the testimony of these other witnesses is not a sufficient basis for finding clear error.

In the alternative, Kathryn argues that, although one of the trust's primary purposes was to protect Kathryn's assets from Medicare or Medicaid, it does not actually fulfill that purpose. She maintains that the "trust should be revokable or reformed" to meet her medical care planning goals. But because Kathryn raised this argument for the first time in her reply brief, it is waived.[12]

Because Kathryn has not established that the superior court's finding that the trust as written conforms to her original intent was clearly erroneous, we are compelled to conclude that reformation under AS 13.36.350 is not warranted.

### 2. Unanticipated circumstances

Alaska Statute 13.36.345(a) provides that

> [o]n petition by a trustee, settlor, or beneficiary, a court may modify the administrative or dispositive terms of an irrevocable trust or terminate an irrevocable trust if, because of circumstances not anticipated by the settlor, modification or termination would substantially further the settlor's purposes in creating the trust.[13]

---

[11]     *Fyffe v. Wright*, 93 P.3d 444, 450-51 (Alaska 2004) ("[I]f most of the evidence is oral testimony, or the superior court's factual determinations depend largely on conflicting testimony, then the superior court's greater ability to assess witness credibility requires deferential review by this court.").

[12]     *See* Alaska R. App. P. 212(c)(3); *Willoya v. State, Dep't of Corr.*, 53 P.3d 1115, 1126 (Alaska 2002).

[13]     In its Findings of Fact and Conclusions of Law, the superior court wrote that unanticipated circumstances must be proven by clear and convincing evidence. This appears to be an error. Although AS 13.36.350 explicitly provides that the settlor's intent must be proven by "clear and convincing evidence," AS 13.36.345 contains no analogous provision. However, because we conclude that the facts Kathryn alleges, even

(continued...)

In her petition, Kathryn argued that she did not "anticipate[] that the circumstance would arise where she would have no control as to when or if her bills would be paid, or when or how her money was to be spent."

But a misunderstanding about the effect of a legal instrument is not an unanticipated circumstance. Something "anticipated" is "foresee[n]," "give[n] advance thought," or "expect[ed]."[14] That is, unanticipated circumstances are facts about the *future* that were not known to the settlor at the time the trust was executed and, if they had been known, would have caused the settlor to draft the trust provisions differently.[15] That a settlor was mistaken about the legal effect of a trust is not an unforeseen fact about the future but a mistake "in expression in the trust" that might warrant reformation under AS 13.36.350(a).

Therefore, as the superior court concluded, termination under AS 13.36.345 is not warranted.

---

[13] (...continued)
if true, are not "unanticipated circumstances" within the meaning of AS 13.36.345, the superior court's application of a higher burden of proof was harmless.

[14] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 50 (10th ed. 1999).

[15] *See, e.g., In re Trust D Created Under Last Will & Testament of Darby*, 234 P.3d 793, 800 (Kan. 2010) ("Courts have generally been more willing to allow modification for unanticipated circumstances where there are truly *unforeseen* events resulting in economic hardship, the incapacity of a beneficiary, the impossibility or imprudence of a trust provision, or the diminution in value of a trust asset." (emphasis added)); *Niemann v. Vaughn Cmty. Church*, 113 P.3d 463, 471 (Wash. 2005) (" '[C]ircumstances not anticipated by the settlor' . . . include significant congregational growth, limitations with the building and property, stricter development and building codes, . . . and finally changes in the attitudes, expectations, and needs of parishioners compared with the 1950s." (citation omitted)).

### 3. Modification or termination by consent

AS 13.36.360 provides that

> on petition by a trustee settlor or beneficiary, a court may modify or terminate an irrevocable trust if all of the beneficiaries consent and if continuation of the trust on the existing terms of the trust is not necessary to further a material purpose of the trust. However, the court, in its discretion, may determine that the reason for modifying or terminating the trust under the circumstances outweighs the interest in accomplishing the material purposes of the trust.

On appeal, Kathryn argues that termination is permissible under AS 13.36.360 because she petitioned the court to terminate the trust as "both . . . the settlor and sole life beneficiary of the trust."

But Kathryn never argued before the superior court that AS 13.36.360 applies to this case. Therefore, her argument that the trust may be terminated by consent is waived.[16]

Even if this argument were not waived, because Kathryn is not the sole beneficiary of the trust, AS 13.36.360 does not provide a basis for termination. Kathryn is correct that she is the "primary *lifetime* [b]eneficiary" of the trust, but several of her children are also *future* beneficiaries. Therefore, Kathryn cannot terminate the trust under AS 13.36.360(a) without obtaining the consent of the other beneficiaries, and the record gives no indication that they have consented to termination.

---

[16] *Maines v. Kenworth Alaska, Inc.*, 155 P.3d 318, 329 (Alaska 2007) ("It is well-established that matters that were not made issues in the trial court . . . or that were not tried before the court will not be considered on appeal." (internal quotation marks and alterations omitted)).

## B. Undue Influence

Kathryn's brief also suggests that the trust is invalid because it was the product of Donna's undue influence. The superior court concluded that "Kathryn presented no evidence to support a claim of undue influence."

"A transfer in trust or declaration of trust can be set aside, or the terms of a trust can be reformed, upon the same grounds as those upon which a transfer of property not in trust can be set aside or reformed."[17] For example, a trust may be set aside if "its creation was induced by fraud, duress, or undue influence."[18]

Undue influence is the exercise of such control over a person that the person is unable to exercise "free and deliberate judgment" or is coerced "into doing something that would not have been done absent the influence."[19] In order to prove that a trust was the product of undue influence, a party must demonstrate that

(1) the target of the alleged undue influence was susceptible to influence;

(2) another person had the opportunity to exert influence;

(3) improper influence was, in fact, exerted; and

(4) the trust shows signs of the improper influence.[20]

Whether the influence exerted on the settlor was undue is determined using a subjective standard, that is, "considering [the settlor's] physical and mental condition, the person by whom [the influence] was exerted, the time and place and all the

---

[17] RESTATEMENT (THIRD) OF TRUSTS § 12 (2003).

[18] *Id.* § 12 cmt. b.

[19] *In re Adoption of S.K.L.H.*, 204 P.3d 320, 328 n.41 (Alaska 2009) (quoting 25 AM. JUR. 2D *Duress and Undue Influence* § 36 (2004)) (internal quotation marks omitted).

[20] *Id.*

surrounding circumstances."[21] Undue influence must be proven by clear and convincing evidence.[22]

Kathryn suggests that Donna's improper influence on Kathryn is evidenced by the fact that, contrary to the superior court's finding, Donna, not Ingaldson, was the primary proponent of the trust.

But the superior court's finding that Ingaldson "encouraged Kathryn to consult with attorney John Colver about establishing a trust" was not clearly erroneous. Ingaldson testified that he spoke with Kathryn about estate planning "many times," "literally when we first met on up," and that they discussed "some general issues dealing with setting up a trust and . . . putting assets into a trust and the pros and cons about doing that." And although Donna's testimony suggests she was concerned about estate planning and may have encouraged Kathryn to put her property in a trust, that evidence is not inconsistent with a finding that Ingaldson also recommended Kathryn execute a trust.

Moreover, even if the superior court did clearly err in finding that Ingaldson proposed creating the trust, that error would not require reversal. That the trust was Donna's idea does not by itself constitute clear and convincing evidence that Donna exerted *improper* influence on Kathryn. There are many benign explanations for Donna's decision to propose and advocate for the trust.

Kathryn also suggests that Donna had ample opportunity to exert improper influence on Kathryn because Kathryn placed significant trust in her. It is true that, at the

---

[21]     *Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001) (quoting 1 WILLIAM J. BOWE & DOUGLAS H. PARKER, PAGE ON THE LAW OF WILLS § 15.2, at 715 (rev. ed.1960)) (internal quotation marks and alteration omitted) .

[22]     *Laliberte v. Mead*, 628 A.2d 1050, 1052 (Me. 1993); *Wright v. Roberts*, 797 So. 2d 992, 998 (Miss. 2001); *Peterson v. Peterson*, 432 N.W.2d 231, 236 (Neb. 1988).

time the trust was executed, Kathryn relied on Donna to manage her finances. Eventually, Kathryn created a joint bank account with Donna so that Donna could pay Kathryn's bills directly. Kathryn also depended on Donna and Danny for transportation to and from her meetings with Ingaldson and Colver because she has an eye condition that prevents her from driving.

But Kathryn's relationship with Donna was not a confidential relationship such as would trigger a presumption of undue influence.[23] A confidential relationship does not necessarily arise from a family relationship.[24] Nor does the fact that Donna helped Kathryn manage her affairs convert their relationship into a confidential one.[25]

At trial, Kathryn's attorney implied that undue influence is evident from the fact that the trust instrument only provides for distribution to three of her sons — Danny, Steve, and Mark — and excludes Rick and Gorden. Kathryn's testimony suggested that

---

[23] *See Paskvan v. Mesich*, 455 P.2d 229, 233 (Alaska 1969) ("[W]hen the principal or sole beneficiary under a will, who had a confidential relationship with the testator, participated in the drafting of the will, then a presumption of undue influence arises.").

[24] *Ware v. Ware*, 161 P.3d 1188, 1194-95 (Alaska 2007) (confidential relationship cannot be proven by "[t]he mere fact of a parent-child relationship").

[25] *Compare Ware*, 161 P.3d at 1195 ("While the record shows evidence of Brandie helping Margaret by checking her oil, cutting wood, and purchasing a new washing machine for her, these activities . . . do not change the relationship from parent-child to that of a fiduciary."), *with Paskvan*, 455 P.2d at 232 (concluding that a finding that a confidential relationship existed was not erroneous where "Mesich's actions in making Paskvan the managing partner in the Arctic Hotel enterprise, in giving Paskvan his power of attorney so that Paskvan could act and speak for Mesich, in executing his will in favor of Paskvan so that there would be a basis for their partnership venture, and in conveying to Paskvan a one-half interest in the Elbow Room property shows quite clearly that Mesich trusted Paskvan and reposed confidence in him — that he relied upon Paskvan to act in Mesich's best interests in handling his affairs.").

this was contrary to her intent. However, it was undisputed that a will Kathryn executed in 2002 provided for a similar distribution of property. Ingaldson explained this arrangement at trial: "Rick and Gord[e]n had received their inheritance in the form of the [Anchorage Roofing] business . . . from Day One, that was what they were to get." Therefore, as the superior court concluded, the "character and provisions of the trust were not such that it would have been unnatural for a person in Kathryn's position to create it."

Although it is true that Kathryn was in her early 80s when the trust was drafted, there is ample evidence in the record that she participated actively in the trust drafting process and was fully capable of protecting her interests. And, as the superior court found, "[t]he strongest evidence against undue influence is that Kathryn had independent legal advice from two experienced, highly respected lawyers (Ingaldson and Colver), both of whom recommended Kathryn establish the Trust."

Given the superior court's findings — none of which is clearly erroneous — we are compelled to agree that Kathryn has not established by clear and convincing evidence that the trust was the product of undue influence.

V.    CONCLUSION

The judgment of the superior court is AFFIRMED.